GERARD J. TWIBILL, PETITIONER-DEFENDANT, v. FEDERAL SHIPBUILDING AND DRY DOCK COMPANY, RESPONDENT-PROSECUTOR.

Argued May 6, 1947—Decided January 15, 1948.

Before CASE, CHIEF JUSTICE, and Justice BURLING.

For the petitioner-defendant, *John A. Laird* and *David Roskein.*

For the respondent-prosecutor, *Stryker, Tams & Horner* (*William L. Dill, Jr.*).

The opinion of the court was delivered by

CASE, CHIEF JUSTICE. This is a workman's compensation case. The Bureau and, on appeal, the Essex Common Pleas allowed a one hundred per cent. compensable disability due to a general paresis marking a development of syphilis of the brain. The syphilis was a pre-existing condition, but the paresis was said to be sequentially related to an accident arising out of and in the course of the employment in that the accident was found to have caused a flare-up of theretofore existing but quiescent conditions. The dispute is largely one of fact as to the phases of the accident and whether they awakened a dormant disease.

On June 18th, 1943, claimant, in the course of his work, was on a small pontoon about six or eight inches above the surface of the waters of Newark Bay alongside a ship which was under construction. He fell into the water and received physical injuries the extent and effect of which are in controversy. It is conceded that the incident constituted an accident which arose out of and in the course of the employment. The record of the hospital department of the employing company, made by the "first-aid" attendant who responded to the call, contains this entry:

"Complaints and Findings—(1) Deep lac about 1st & 2nd fingers Lt hand. (2) Abrasions about Lt hand & Elbow. (3) Cont. & abrasions about both thighs. (4) Cont & abrasion on Lt Side of chest. (5) Submersion."

The injury to the hand was quite severe and received hospitalization at St. Francis Hospital covering a period of three days, during which there was a suturing of the laceration and a reduction of dislocation done under an anesthetic. The claimant returned to work on June 22d, 1943, and continued to work until the middle of July. On August 31st, 1943, he was admitted to the Veterans' Hospital at Lyons, New Jersey, suffering from paresis and was still a patient there, unable to testify, at the time of the hearing in the Bureau.

The record subsequent to the observation made at the plant hospital appears to be silent about the abrasions at the elbow, the thighs and the chest, and we conclude that those injuries were not serious. The case turns largely upon the causal

effect of the hand injury and of the submersion and particularly upon the actuality and the effect of an alleged injury at the back of the head. We are not impressed by the contention that falling, in mid-June, into the water from a level six or eight inches above the surface thereof and the subsequent wetting substantially affected the man's underlying syphilitic disease. We find no proof of a condition of shock when the claimant was found, injured, on the pontoon or while he was briefly at the plant hospital or while he was in St. Francis Hospital. He was carried by basket from the pontoon to the dock, but that was because he was unable, with his injured hand, to climb the ladder.

Much is made of the alleged injury to the back of the head, said to have been evidenced by a lump or discoloration. A friend testified that he met the claimant on the street about the fourth of July, 1943, and that he saw and felt a lump about the size of an egg on the back of the latter's head. The claimant's wife testified that on the day after her husband's return from the hospital she was combing his hair and for. the first time noticed a red mark on the back of his head, that there was not and never had been a lump, that the friend must have been mistaken and that the discoloration was still there at the time of the giving of the testimony, which was well over a year after the accident. Dr. Dolsky, who was one of claimant's three medical witnesses, testified that on June 24th, 1943, he found a discolored area about the size of a half dollar, not swollen and not painful to the touch, that he did not know when the mark first appeared or whether it came from the injury and that if the condition had maintained until the time testified by Mrs. Twibill it would not be typical of a contusion on the head. Dr. Dolsky also testified that if the claimant did not receive a bump on the head when he fell at the shipyard, it was the opinion of the witness that the subsequent psychosis did not result from the fall. Dr. Stockfish, another of the claimant's medical witnesses, testified that he examined claimant's head on August 5th, 1943, and found no mark there, and that it was reasonable, although not necessarily the fact, that if discoloration had been the result of a bump, there would have been some tenderness in the area

six days after the injury, which was the time of Dr. Dolsky's examination. Dr. Fagley, the third of claimant's medical witnesses and a member of the staff at Lyons Hospital, said that he made a complete examination at the hospital on September 14th, 1943, and found no bump, red spot or evidence of trauma on the claimant's head. The records at the plant hospital and at St. Francis Hospital contain no note thereof. The student nurse who gave day attendance to the claimant at the hospital testified that the patient made no complaint of having pain or difficulty about his head and that she observed no bruise, bump or other irregularity. Dr. Sheeran, who performed the operation at the hospital and saw the patient each day of his stay there, testified likewise. It may be inferred from the accidental manner in which Mrs. Twibill noticed the mark that her husband had not called the spot to her attention. There was no proof of unconsciousness, or bleeding from the nose, mouth or ears following the accident. The testimony by Dr. Dolsky, admitted over objection, that the claimant, on June 24th, 1943, said that he had struck his head in the fall at the shipyard was hearsay and incompetent to prove place or cause of injury. *Helminsky* v. *Ford Motor Co.*, 111 *N. J. L.* 369; *Friese* v. *Nagle Packing Co.*, 110 *Id.* 588; *Korman* v. *Hygrade Food Products Corp.*, 131 *Id.* 188. The absence of concomitant incidents usual to a concussion or other head or brain injury serve to distinguish the case from *Hercules Powder Co.* v. *Nieratko*, 113 *Id.* 195. Weighing all of the testimony, we are not satisfied that there was a contusion or swelling on the head or that the discoloration was the result of an injury received on June 18th, 1943, or that there was such an injury; and we find the fact accordingly.

The theory propounded by Dr. Robert H. Stockfish, a physician who specializes in neurology and psychiatry, was that "the injury to the hand, by reason of its crushing nature, in all reasonable probability affected not only the blood vessels, but the nerve fibers on each side of the bones—in other words, the peripheral nerves"—and that that injury, combined with the shock of submergence and of some injury to the head indicated by the discolored area, "brought about sufficient dis-

turbance in the lowering of the resistance so that the toxins of the spirochets pallida which caused the lues was liberated in the central nervous system and brought about the rapid and deteriorating changes" resulting in a "psychosis with meningal cephalitis of the central nervous system due to syphilis;" but that "the big factor was the crushing injury * * * to the left hand, wherein he sustained multiple comminuted fractures, the injury that opened the channel in the nerves and bone permitting the entry of infected blood to be transmitted by the opened nerves through the channel thus provided," that "the injury to the hand * * * brought about changes in that area by releasing infected blood which could be transmitted into the channels of the bone and also taken up within the nerve sheath that injured and thus bring itself up to the central nervous system from which the peripheral nervous system is derived." The theory that the hand injury would, by crushing the bones and nerves, transmit the patient's blood, with its syphilitic content, through the bone channels and nerve sheaths to the brain and so be the means of poisoning that organ with syphilitic toxins, notwithstanding the same diseased blood was already in the brain by the natural circulatory processes, is difficult for the lay mind to grasp. Further, the theory was under strong attack from the expert witnesses who testified for the respondent. Dr. Jack Blumberg characterized it as a theory "absolutely contrary to any known medicine." Dr. M. W. Bergman said: "I do not ascribe [subscribe?] to such a theory. * * * I have heard of it, I do not ascribe to it." Dr. Christopher C. Beling said: "It does not happen. Anything is possible but it is a most improbable thing the traveling of toxins along the sheaths of nerves. One must understand that paresis is a systemic disease due to infection by the spirochete that gets into the brain, and the blood carries it to the brain." He added that the diseased blood was in the brain before, as well as after, the laceration. The testimony that the claimant's paresis was occasioned by the enumerated reactions from the hand injury is not persuasive.

It is true that marked advance in the claimant's paretic condition came relatively soon after his occupational accident,

but this, in the absence of stronger support than is afforded by the present proofs, is to be taken as a coincidence. Under the facts of the case, a finding for the claimant may not be made to depend upon that sequence. Paresis, according to the testimony, is an organic disease of the brain which comes after a long period of progressive degenerative changes caused by syphilis in the brain's substance, a period said by one of claimant's medical experts to be at least three years. It can come, and usually does, without any factor outside of the progressive incidents of the disease. Degenerative changes in the claimant's brain may have been going on for a considerable period before his accident. He had exhibited emotional disturbances which claimant's proofs have not explained to our satisfaction and which may have been the result of early paresis development. A man's mental and physical experiences, the treatments given and the results thereof and the hospital or other records attesting thereto are peculiarly within the knowledge or the reach of the individual or of those who are acting for him. It is not shown how far back of 1936 the claimant was afflicted with syphilis, but it is known that he had the ailment in 1936 because he then submitted to a series of treatments for it—"shots"—at the Elizabeth General Hospital. Mrs. Twibill caused her husband to be arrested for assaulting her on January 2d, 1938, when she concedes she charged him with grabbing her by the throat and tearing her clothes from her body and with making, on numerous occasions, threats to kill her. She now says that he did such things but that he did them only when he was under the influence of liquor and that her reason for not earlier so qualifying the nature of his attacks was that she "was mad then." Yet the actions so attributed to her husband appear to be somewhat comparable to the disposition of the patient after admission to the hospital at Lyons as described by Dr. Fagley—"very hyperactive, surly and threatening." It also appears that the claimant was a patient at the Veterans Administration at Bath, New York, from September 18th, 1939, to November 10th, 1939, and that a part of the diagnosis there made was "neurasthenia, mild." While a trauma, and particularly a trauma of the head, of sufficient severity may

precipitate degenerative processes taking place in the brain of a syphilitic patient, we find no convincing evidence of such a trauma as would produce that result. Inasmuch as paresis does within reasonable expectation come to a man suffering from syphilis, the presumption is that the end result was due solely to the disease. The burden is on the claimant to establish, by evidence, that the doing of the master's work was at least a contributory cause; *Dicker* v. *Independent Biscuit Co., Inc.,* 134 *N. J. L.* 203; *affirmed,* 134 *Id.* 618. That fact has not been established.

We conclude that the claimant has not successfully carried the burden of proof and that the paresis was not precipitated by the accident of June 18th, 1943. The judgment below is reversed, but without costs. The record will be remanded with direction to enter an award of compensation for the permanent disability as to the left hand.